UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Seren Innovations, Incorporated, Transcontinental Insurance Company, and Continental Casualty Company,

Plaintiffs,

vs.

The Travelers Indemnity Company of America, The Travelers Indemnity Company of Illinois, and Does 1-10,

Defendants.

Court File No. 04-cv-4978

---

**DEFENDANTS THE TRAVELERS INDEMNITY COMPANY OF AMERICA AND TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA F/K/A THE TRAVELERS INDEMNITY COMPANY OF ILLINOIS' REQUESTS FOR ADMISSION, INTEGRATED INTERROGATORIES AND INTEGRATED REQUEST FOR PRODUCTION OF DOCUMENTS TO SEREN INNOVATIONS, INCORPORATED, TRANSCONTINENTAL INSURANCE COMPANY AND CONTINENTAL CASUALTY COMPANY**

---

TO: PLAINTIFFS SEREN INNOVATIONS, INCORPORATED; TRANSCONTINENTAL INSURANCE COMPANY; AND CONTINENTAL CASUALTY COMPANY.

PLEASE TAKE NOTICE, that pursuant to Rule 34 of the Federal Rules of Civil Procedure, Defendants, The Travelers Indemnity Company of America and Travelers Property Casualty Company of America f/k/a The Travelers Indemnity Company of Illinois ("Travelers"), hereby request that Plaintiffs admit the truth of the following statements. The following statements will be deemed to be admitted, for the purposes of this action only, unless within 30 days after service of this request upon you, you serve upon the undersigned specific written denials or objections. If you cannot

EXHIBIT 1

truthfully admit or deny any statement, you must set forth the reasons why you cannot do so in detail.

1. Admit that Seren Innovations, Inc. ("Seren") is an additional insured or insured entitled to coverage for the claims alleged against it in the St. Cloud gas explosion litigation which is the subject of this lawsuit under policies of insurance issued by Transcontinental Insurance Company ("TIC") and Continental Casualty Company ("Continental").

2. Admit that TIC and Continental owed Seren an independent duty to defend claims brought against Seren in the St. Cloud gas explosion litigation.

3. Admit that attached hereto as Exhibit A is a complete copy of the AIA Document B141-1997 Standard Form of Agreement Between Owner and Architect entered into between Seren Innovations, Inc. and Sirti Limited Corp. ("Sirti") made as of March 10, 1998 ("Agreement").

4. Admit that the Agreement between Seren and Sirti is the only document wherein Sirti contractually agreed to provide any indemnity to Seren for the St. Cloud project.

5. Admit that the specific indemnity agreement entered into between Seren and Sirti is contained on page 16 of the Agreement at Section 1.3.6.16 Indemnity.

6. Admit that the indemnity provision in the Agreement does not require Sirti to defend Seren for any claims made against it, nor does it require Sirti to pay any defense fees or expenses incurred in defending Seren for claims made against it.

7. Admit that attached hereto as Exhibit B is a true and accurate copy of the Additional Insured Endorsement contained on Sirti's Commercial General Liability Policy with Travelers ("Additional Insured Endorsement").

8. Admit that the Additional Insured Endorsement identifies an insured as follows:

> **WHO IS AN INSURED** (Section II) is amended to include any person or organization you are required by written contract to include as an insured, ***but only with respect to liability arising out of "your work." This coverage does not include liability arising out of the independent acts or omissions of such person or organization. The written contract must be executed prior to the occurrence of any loss.***
>
> . . .

9. Admit that the terms "you" and "your work" as used in this blanket Additional Insured Endorsement refer specifically to Sirti, and not Seren.

10. Admit that pursuant to the clear and unambiguous terms of the Additional Insured Endorsement, the Additional Insured Endorsement does not provide coverage for liability arising out of the independent acts or omissions of Seren.

11. Admit that the only coverage Seren could claim as an additional insured under Travelers' insurance policy is for the vicarious liability claims that could be made against Sirti.

12. Admit that Seren has no vicarious liability exposure for any acts or negligence of Sirti, as Seren has resolved all claims made against it with any potential claimants in separate agreements which specifically preserved any of claimants or Plaintiffs' claims against Sirti.

13. Admit that the Additional Insured Endorsement includes an exclusion for liability "arising out of the rendering of or the failure to render any professional services as defined in Paragraph 4 of the blanket Additional Insured Endorsement attached hereto as Exhibit B ("Professional Services Exclusion to Additional Insured Endorsement").

14. Admit that the professional services exclusion to the Additional Insured Endorsement precludes coverage to Seren for any and all claims arising out of either Sirti or Seren's professional services provided on the St. Cloud project.

15. Admit that Seren has no documentation or evidence to establish indemnity payments made by Seren, or anyone on its behalf, to settle claims made by Plaintiffs for Seren's exposure specifically or independently, as opposed to settlements made jointly by Seren and Cable Contractors Inc. ("CCI").

16. Admit that any settlement agreement reached between Plaintiffs or claimants and Seren included amounts or payments which extinguished or released Plaintiffs' claims for punitive damages against Seren.

17. Admit that Seren did not segregate or relocate any specific amounts of its settlements with Plaintiffs to punitive damages, independent acts and negligence by Seren or any vicarious liability exposure to Seren for the acts of Sirti.

18. Admit that Transcontinental Insurance Company ("Transcontinental") and Continental Casualty Company ("Continental") issued insurance policies to CCI which provided general liability insurance coverage to both CCI (as an insured) and Seren (as an additional insured) for property damage and bodily injury claims made against CCI and Seren arising out of the St. Cloud gas explosion.

19. Admit that Seren was an additional insured under a Commercial General Liability Policy issued by Transcontinental and Continental to CCI.

20. Admit that Transcontinental and Continental had a duty to provide a defense and indemnity as the primary insurance carrier of Seren under an additional insured endorsement in CCI's insurance policies.

21. Admit that Seren had a Commercial General Liability policy of insurance that it obtained on its own behalf which provided coverage for the benefit of Seren for those claims made against Seren for bodily injury and property damage arising out of the St. Cloud gas explosion litigation.

22. Admit that Seren's own insurance company had a duty to provide a defense and indemnity for any and all claims for bodily injury or property damage made against Seren as its primary commercial general liability insurance carrier for claims arising out of the St. Cloud gas explosion.

23. Admit that Travelers' Additional Insured Endorsement specifically provides, in pertinent part, as follows:

> 2. With respect to the insurance afforded to the Additional Insureds, the following conditions apply:
>
> a. Limits of Insurance – The following limits of liability apply
>
> 1. The limits which you agreed to provide or
> 2. The limits shown on the declarations.
>
> Whichever is less.
>
> b. This insurance is excess over any valid and collectible insurance unless you have agreed in a written contract for this insurance to apply on a primary or contributory basis.

See blanket Additional Insured – Owners, Lessors or Contractors, which was the endorsement attached to Travelers' Commercial General Liability policy issued to Sirti in effect at the time of the St. Cloud gas explosion.

24. Admit that pursuant to the clear and unambiguous terms of the Travelers Additional Insured Endorsement, any coverage that could arguably provide coverage to Seren as an additional insured under the blanket Additional Insured Endorsement would be deemed excess to any other insurance which provided coverage to Seren.

25. Admit that pursuant to the clear and unambiguous terms of the blanket Additional Insured Endorsement issued by Travelers to Sirti, Travelers does not owe Seren any duty to defend any claims brought against Seren as a result of the St. Cloud gas explosion.

26. Admit that the only policy against which Seren claims it is an additional insured is the Commercial General Liability policy issued by Travelers Property Casualty which includes an additional insured endorsement with policy limits of

$1,000,000.00, all of which coverage is defined by the terms and conditions set forth in the entirety of the Commercial General Liability policy.

27. Admit that neither Seren, nor its other insurance carriers, are making any claim for coverage under the Umbrella (excess) policy of insurance issued by Travelers to Sirti.

28. Admit that Seren has not incurred any of its own out of pocket expenses or attorney's fees in defending the claims in the St. Cloud gas explosion litigation.

**INTEGRATED INTERROGATORIES**

1. In the event that you do not provide an unqualified admission to any of the above requests for admission, with respect to each such refusal, failure to admit, or qualified admission, please state the following:

a. All facts, matters or other circumstances upon which said refusal or failure to admit is based; and

b. The identity of all witnesses that have knowledge of each such fact, matter or other circumstance.

**INTEGRATED REQUEST FOR PRODUCTION OF DOCUMENTS**

1. Identify and produce each and every document upon which you relied to respond to the above requests for admission and integrated interrogatories.

DATED: July 1, 2005

MURNANE BRANDT

DANIEL A. HAWS #193501
Attorneys for Defendant The Travelers Indemnity Company of America and Travelers Property Casualty Company of America f/k/a The Travelers Indemnity Company of Illinois
30 East Seventh Street, Suite 3200
St. Paul, MN 55101
(651) 227-9411

659100

1997 EDITION

# AIA DOCUMENT B141-1997

## Standard Form of Agreement between Owner and Architect With Standard Form of Architect's Services

**AGREEMENT** made as of the 10th day of March
in the year 1998

**BETWEEN** the Architect's client identified as the Owner:

Seren Innovations, Inc.
10 South 5th Street, Suite 840
Minneapolis, MN 55402

and the Architect: MT GAH

SIRTI Limited ~~Corp.~~ SIRTI LIMITED
5907-~~D~~ Hampton Oaks Parkway registered Office in
~~Tampa~~, Florida 33610 Minnesota:
201 Little Canada Rd
St. Paul MN 55117

For the following Project:

Architect shall provide all engineering, design, drafting, mapping, licensing, permitting and specification development and preparation work required for the construction of a two-way, 750Mhz HFC system, supporting CATV, telephony and Internet services within the defined geographic boundaries in the St. Cloud geographic area ("Services").

TABLE OF ARTICLES

1.1 INITIAL INFORMATION

1.2 RESPONSIBILITIES OF THE PARTIES

1.3 TERMS AND CONDITIONS

1.4 SCOPE OF SERVICES AND OTHER SPECIAL TERMS AND CONDITIONS

1.5 COMPENSATION



EXHIBIT
A

## ARTICLE 1.1 INITIAL INFORMATION

1.1.1 This Agreement is based on the following information and assumptions.

### 1.1.2 PROJECT PARAMETERS

1.1.2.1 The objective or use is:

The Owner and Architect agree that the Project, when design and construction are complete under this Agreement, will provide service to both residential and commercial subscribers with a network involving approximately 35,000 passings.

1.1.2.2 The physical parameters are:
Exhibit A – Architects Scope of Work
Exhibit F – Project Boundaries

1.1.2.3 The Owner's Program is:
Exhibit A – Architects Scope of work

1.1.2.4 The financial parameters are as follows.
Amount of the Owner's overall budget for the Project, including the Architect's compensation, is: $16.0 Million

Architect's compensation, is:

See Section 1.5 of Agreement.

1.1.2.5 The time parameters are:
Exhibit D – Contract Schedule

1.1.2.6 The proposed procurement or delivery method for the Project is:
Competitive bid and negotiated contract

1.1.3 **PROJECT TEAM**

1.1.3.1 The Owner's Designated Representative is:

Brad Zuehlke
Chief Network Planner
Seren Innovations, Inc.
10 South 5th Street, Suite 840
Minneapolis, MN 55402
(612) 904-5407
Fax (612) 904-5415

1.1.3.2 The Architect's Designated Representative is:

Mr. Mauro Tosi
Sirti Limited Corp
5907 D Hampton Oaks Parkway
Tampa, FLA 33610
(813) 623-6333
fax (813) 623-6455

1.1.4 When the services under this Agreement include contract administration services, the General Conditions or the Contract for Construction shall be the edition of AIA Document A201 current as of the date of this Agreement, or as follows:

1.1.5 The information contained in this Article 1.1 may be reasonably relied upon the Owner and Architect in determining the Architect's compensation and scope of services. Both parties, however, recognize that such information may change and, in that event, the Owner and the Architect shall negotiate appropriate adjustments in schedule, compensation and Change in Services in accordance with Paragraph 1.3.3.

**ARTICLE 1.2 RESPONSIBILITIES OF THE PARTIES**

1.2.1 The Owner and the Architect shall cooperate with one another to fulfill their respective obligations under this Agreement. Both parties shall endeavor to maintain good working relationships among all members of the Project team.

1.2.2 **OWNER**

1.2.2.3 Unless otherwise provided under this Agreement, the Owner shall provide full information in a timely manner regarding requirements for and limitations on the Project. The Owner shall furnish to the Architect, within 15 days after receipt of a written request, information necessary and relevant for the Architect to evaluate, give notice of or enforce lien rights.

1.2.2.4 The Owner shall periodically update the budget for the Project, including that portion allocated for the Cost of the Work. The Owner shall not significantly increase or decrease the overall budget, the portion of the budget allocated for the Cost of the Work, or contingencies included in the overall budget or a portion of the budget, without the agreement of the Architect to a corresponding change in the Project scope and quality.

1.2.2.5 The Owner's Designated Representative identified in Paragraph 1.1.3 shall be authorized to act on the Owner's behalf with respect to the Project. The Owner or the Owner's Designated Representative shall render decisions in a reasonably timely manner pertaining to documents submitted by the Architect in order to avoid delay in the orderly and sequential progress of the Architect's services.

1.2.2.6 The Owner shall furnish all legal, insurance and accounting services, including auditing services, that may be reasonably necessary at any time for the Project to meet the Owner's needs and interests.

1.2.2.7 The Owner shall provide prompt written notice to the Architect if the Owner becomes aware of any fault or defect in the Project, including any errors, omissions or inconsistencies in the Architect's Instruments of Service.

1.2.3 **ARCHITECT**

1.2.3.1 The Services performed by the Architect, Architect's employees and Architect's consultants shall be as enumerated in Article 1.4, Exhibit A and the description of the Project and Services.

1.2.3.2 The Architect's services shall be performed as expeditiously as is consistent with professional skill and care and the orderly progress of the Project. The Architect shall develop and maintain a detailed schedule for the services required by this

Agreement. The schedule shall be a work plan based on network diagrams showing activities to be performed and their sequence, and in addition, activities shall contain duration, personnel required and estimated cost. Interfaces and restraints between activities are to be included. Activity codes are to be assigned to each activity to permit selective printouts of information of specific interest to each design department or group, project management or owner. The schedule shall include Architect materials and equipment procurement activities and expected delivery dates, as applicable.

Architect shall prepare and submit a preliminary schedule to Owner within fifteen (15) days after execution of this Agreement for Owner's review and establishment of the level of schedule detail to be included by Architect.

The Architect shall submit weekly progress data for the reporting period which shall include the quantities accomplished and the actual start date and actual finish date for all activities worked on by the Architect during the period. Any changes in delivery dates shall be identified and reported. Other information, such as actual hours expended, shall be furnished monthly or as requested by Owner. Revisions to the network shall be incorporated into the schedule as they are developed. If requested by Owner, schedule update meetings shall be held to discuss the results of schedule analysis and necessary action to meet the requirements of the schedule.

Provided that timely written notice thereof is given to the Architect or as the case may be Owner, the Architect or Owner shall not be liable for delays in the performance of services or failure to timely perform the services due to causes not reasonably foreseen by the Owner or the Architect or its consultants, which are beyond the Owner's, Architect's or its consultants' control, such as Acts of God, lawful acts of civil or military authorities, government priorities, fires, floods, declared war or riot.

1.2.3.3 The Architect's Designated Representative identified in Paragraph 1.1.3 shall be authorized to act on the Architect's behalf with respect to the Project.

1.2.3.4 The Architect acknowledges that it, its employees, officers, owners and/or agents may acquire, learn or become aware of the confidential, trade secret, proprietary or other like information of Owner or a third party who has supplied information to Owner. The Architect expressly agrees to keep all such confidential information absolutely confidential whether or not the information is identified as confidential at the time of its disclosure. In no event shall the Architect, its employees, officers, owners and/or agents disclose such confidential information to any third party. If the Architect

is ordered by a regulatory body or court having appropriate jurisdiction to disclose such confidential information, the Architect shall timely notify the Owner and afford for the Owner at the Owner's expense the opportunity to request that such information be kept confidential by the court or regulatory body as the case may be.

1.2.3.5 Except with the Owner's knowledge and consent, the Architect shall not engage in any activity, or accept any employment, interest or contribution that would reasonably appear to compromise the Architect's professional judgment with respect to this Project.

1.2.3.6 Reference to the standards of any technical society, organization or association, or to any applicable national, state or local codes or standards, shall mean the latest standard, code, specification or tentative standard adopted and published as amended from time to time, unless specifically stated otherwise.

Architect and its employees, agents, representatives and its consultants and subcontractors shall at all times comply with all applicable federal, state and local codes, laws, ordinances, statutes, rules, standards or regulations as such are amended from time to time. The Architect shall also furnish services which conform to all applicable safety codes and regulations. If during the term of this Agreement there are any changes or additions to codes, laws, ordinances, statutes, rules, standards or regulations not reasonably known or foreseeable to the Architect at the time of execution of this Agreement, the Architect shall immediately notify Owner in writing and submit detailed documentation of such effect in terms of both time and cost of performing the Agreement. Upon written concurrence by Owner as to the effect of such changes or additions, an equitable adjustment in the compensation and time of performance shall be made by appropriate written Change Order. If any discrepancy or inconsistency should be discovered between the Agreement and any code, law, ordinance, statute, rule, standard, regulation, order or decree, the Architect shall immediately report the discrepancy in writing to Owner who shall issue such further instructions as may be necessary. The Architect shall proceed with services affected by a discrepancy or inconsistency at its own risk until the Owner has issued written instructions as provided for herein.

1.2.3.7 The Architect shall be entitled to rely on the accuracy and completeness of services and information furnished by the Owner. The Architect shall provide prompt written notice to the Owner if the Architect becomes aware of any errors, omissions or inconsistencies in such services or information.

1.2.3.8 Architect during the RFP process shall not substitute for personnel it has identified to the Owner as available and appropriate to provide Services under this Agreement without the written consent of Owner.

**ARTICLE 1.3 TERMS AND CONDITIONS**

1.3.1 **COST OF THE WORK**

Paragraphs 1.3.1.1, 1.3.1.2 and 1.3.1.3 are deleted. See Paragraph 1.3.9 and Articles 1.4 and 1.5 of this Agreement.

**1.3.2 INSTRUMENTS OF SERVICE AND CERTIFICATION**

Drawings, specifications, calculations, reports and other documents, including those in electronic form, prepared by the Architect and the Architect's consultants under this Agreement are considered Instruments of Service. All Instruments of Service shall become the sole property of the Owner. The Architect hereby agrees to transfer to Owner the entire right, title and interest to the copyright in all works, including those define as work-for-hire under §101 Title 17, United States Code produced by the Architect in the performance of the Agreement. The Architect further agrees to execute any document necessary to perfect the Owner's right, title and interest to the copyright in the Instruments of Service without further payment or compensation. The Instruments of Service shall be delivered to the Owner upon completion of the Architect's Services under the Agreement, however, the Architect may retain and use copies thereof. The Architect agree to provide the Owner notice thirty (30) days prior to the Architect destroying any Instruments of Service. If Owner so requests, the Architect shall forward such Instruments of Service to Owner.

All Instruments of Service shall, if required by or customary under federal or state law or regulation, be certified by a registered professional engineer licensed to practice within the State of Minnesota.

**1.3.3 CHANGE IN SERVICES**

The Owner may at any time make changes to the scope of services by a written Change Order issued to the Architect.

If any such change causes an increase or decrease in the cost of or the time required for performance of any of the services, an equitable adjustment may be made in the price (using Exhibit B, price schedule) or delivery schedule, or both, and the Agreement shall be modified by a written Change Order (Exhibit C).

Any claim by the Architect for adjustment under this article must be asserted within thirty (30) days from the receipt by the Architect of the notification of change. However, nothing in this article shall excuse the Architect from proceeding with the Agreement as changed.

All claims or charges in addition to the Agreement amount (whether for changed or extra services, suspension, termination or as otherwise provided for in the Agreement) shall be shown separately on the Architect's invoices, and not included with amounts applicable to the Agreement amount. Further, any Architect invoices covering additions to the Agreement must refer to the specific Change Order or similar written authorization issued by the Owner, approving such additions, and any invoices shall not be honored by the Owner unless and until such written reference is provided.

1.3.4 **ARBITRATION**

1.3.4.1 Any claim, dispute or other matter in question arising out of or related to this Agreement shall be subject to arbitration.

1.3.4.2 Claims, disputes and other matters in question between the Owner and Architect shall be decided by arbitration which shall be in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association currently in effect. The demand for arbitration shall be filed in writing with the other party to this Agreement and with the American Arbitration Association.

1.3.4.3 A demand for arbitration shall be made within a reasonable time after the claim, dispute or other matter in question has arisen. In no event shall the demand for arbitration be made after the date when institution of legal or equitable proceedings based on such claim, dispute or other matter in question should be barred by the applicable statute of limitations.

1.3.4.4 Arbitration proceedings under this Agreement shall be held in Minneapolis, Minnesota or such other place as the Owner, in its sole discretion, shall designate.

1.3.4.5 The award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable last in any court having jurisdiction thereof.

1.3.5 **CLAIMS FOR CONSEQUENTIAL DAMAGES**

Under no circumstances shall the Owner or Architect be liable to each other for any special, indirect or consequential loss or damage whether or not such loss or damage is caused by the fault or negligence of a party, its employees, agents, consultants or subcontractors of any tier. This exclusion of liability for special, indirect or consequential loss or damage is intended to apply to damage or loss of "commercial" nature such as, but not limited to, loss of profits or revenue, cost of capital, loss of use of equipment or facilities, cost of purchased or replacement power or claims of Owner's customers due to loss of service. This exclusion is not intended to apply to:

1) Loss or damage incidental to a default, termination, suspension or a defect in the Architect's services such as, but not limited to, additional managerial and administrative costs and expenses incurred in effecting a "cover" under a default; removing, reinstalling, repairing or replacing material or equipment due to a defect in the Architect's services; costs of settling claims of Architect's subcontractors and/or consultants or assisting Owner in the maintenance, protection and disposition of property acquired under termination; or

2) Loss or damage to property or personal injuries (including death) or claims based upon patent infringements or to any claims by third parties.

1.3.6 **MISCELLANEOUS PROVISIONS**

1.3.6.1 This Agreement and the definitions of terms used herein and the rights of the parties hereunder shall be construed under and governed by the laws of the State of Minnesota.

1.3.6.2 Terms in this Agreement shall have the same meaning as those in the edition of AIA Document A201, General Conditions of the Contract for Construction, current as of the date of this Agreement to the extent such meanings are not contrary to interpretations under Minnesota law.

1.3.6.3 Causes of action between the parties to this Agreement pertaining to acts or failures to act shall be deemed to have accrued and the applicable statutes of limitations shall commence to run not later than either the date of Substantial Completion for acts or failures to act occurring prior to Substantial Completion or the date of issuance of the final Certificate for Payment for acts or failures to act occurring after Substantial Completion. In no event shall such statutes of limitations commence to run any later than the date when the Architect's services are substantially completed.

1.3.6.4 Nothing contained in this Agreement shall create a contractual relationship with or a cause of action in favor of a third party against either the Owner or Architect.

1.3.6.5 Security

The Architect and its employees, agents, consultants and/or subcontractors of any tier who are required, in the performance of the Services under this Agreement, to have access to the Owner's (or a third party from whom the Owner has obtained a license) computer systems, programs, data, building, facilities, equipment and other property shall perform their work in accordance with the policies and procedures put in place to adequately protect the confidential and secure nature of the Owner's systems and facilities.

The Architect shall restrict access to only those of its employees, agents, consultants and/or subcontractors of any tier having a need for such access in the performance of the Services under this Agreement. The Architect shall maintain appropriate internal policies and procedures adequate to protect the confidential and secure nature of the Owner's systems and facilities and to limit such access.

The Owner may at its sole discretion remove or cause to be removed from the Owner's premises any person who the Owner deems unfit to perform his or her responsibilities, including employees, agents, consultants and/or subcontractors of any tier of the Architect. The Owner shall notify the Architect of any such removal and the Architect shall provide another person acceptable to the Owner to perform hereunder.
1.3.6.6 Warranties

The Architect warrants that it shall perform its Services in accordance with the Agreement and with care, skill and diligence in accordance with applicable professional standards currently recognized by such profession. The Architect shall be responsible

for the professional quality, technical accuracy, completeness and coordination of the Services and other items furnished under the Agreement. For a period of twelve (12) months after final acceptance under the Agreement, the Architect warrants that all Services shall be free from defects in material and workmanship and that all materials and equipment furnished by, or incorporated into the Services, shall be new and of the most suitable grade of their respective kinds for their intended use.

If the Architect fails to meet the foregoing provisions, the Architect shall without additional compensation:

1.3.6.6.1 Re-perform and correct or revise any errors or deficiencies in its Services;

1.3.6.6.2 Repair or replace the affected item or part thereof at a time acceptable to Owner; and

1.3.6.6.3 Reimburse Owner for any costs, expenses or damages suffered by Owner, including but not limited to costs of removal and reinstallation and reprocurement, caused by or attributable to defects or deficiencies in the Architect's Services.

1.3.6.7 Taxes

Unless otherwise specified in the Agreement, the Architect shall pay and account separately to Owner for all sales, use and other taxes that are lawfully assessed against the Architect or its subcontractors/suppliers with the Services included in the Agreement.

1.3.6.8 Permits

The owner shall obtain and pay for all permits and inspections required for the performance of the Services except for licenses or certification required for the Architect to perform their professional services.

1.3.6.9 Release of Liability

Acceptance by the Architect of final payment shall constitute a release of Owner and all its officers, directors, representatives, agents or separate suppliers or

contractors, from all claims and liability for anything done or furnished in connection with the Services, or for any act or neglect of Owner or of any entity or person for whom Owner may have responsibility relating to or affecting the Services.

1.3.6.10 Inspection and Acceptance or Rejection

All Services shall be subject to Owner's inspection at any time. Owner may accept or reject all Services within a reasonable time after their performance. The making or failure to make any inspection of, or payment for, or acceptance of the Services shall in no way impair Owner's right to reject or revoke its acceptance of nonconforming Services, or to avail itself of any other remedies to which Owner may be entitled, notwithstanding Owner's knowledge of the nonconformity, its substantiality or ease of discovery.

1.3.6.11 Owner Review and Approval

Unless otherwise agreed to by express written statement in the Agreement, Owner review and approval of specifications, drawings and related documents developed by the Architect for the Agreement shall in no way or manner relieve or lessen the Architect's responsibility under the Agreement for the professional quality, technical accuracy and completeness of such documents.

1.3.6.12 Notice of Claim for Damages

The Architect agrees not to assert or pursue any claim against Owner for damages or for any other compensation not otherwise provided for specifically in the Agreement unless written notice thereof shall have been given with reasonable particularity to Owner within ten (10) days after the occurrence giving rise thereto.

1.3.6.13 Owner Proprietary Information

All documentation and data, including but not limited to, special techniques, methods, computer programs and software, that Owner considers proprietary and furnishes to the Architect and wants the Architect to maintain confidential shall be marked as proprietary (hereinafter "Owner Proprietary Data") at the time of its disclosure or shortly thereafter. Owner documentation and data not so marked need not be considered by the Architect to be proprietary to Owner. Owner hereby grants to the Architect authority to use Owner Proprietary Data only for purposes of the

Agreement. The Architect agrees to keep such proprietary data confidential, to use it only for work necessary to the performance of the Agreement, and not to sell, transfer, sublicense, disclose or otherwise make available any of such data to others.

The Architect agrees to take all reasonable actions to satisfy its obligations under this article.

Notwithstanding the preceding, this article and the restrictions on the Architect contained therein shall not apply to any data and documentation:

1.3.6.13.1 Which is in the public domain at the time it was disclosed by Owner to the Architect or at any time thereafter;

1.3.6.13.2 Which was already known to the Architect at the time of disclosure to the Architect by Owner;

1.3.6.13.3 After three (3) years from the date of execution of the Agreement unless Owner is subject to longer restriction by a third party and the Architect has agreed in writing to such longer restriction prior to use of such data or documentation;

1.3.6.13.4 Which is independently developed by the Architect; or

1.3.6.13.5 Which becomes known to the Architect from a source other than Owner without breach of the Agreement by the Architect.

In the event of inconsistency between the stamp or legend imprinted on information or data delivered by Owner pursuant to the Agreement and the terms and conditions of the Agreement, the terms and conditions of the Agreement shall take precedence.

1.3.6.14 Supplier Proprietary Data.

As used in this article, "Architect Proprietary Data" shall mean all special techniques, methods, computer programs and software and related items used or employed for Owner's benefit which were developed solely at the time and expense of the Architect and are considered by the Architect to be proprietary.

The Architect agrees to use its best efforts to identify, in its proposal or equivalent document to be incorporated by reference in the Agreement, any Architect Proprietary Data the Architect intends to use in performance of the proposed Services. The Architect shall identify and provide reasonable prior written notice to Owner of any Architect Proprietary Data the Architect intends to use prior to the use of such data.

All Architect Proprietary Data must be clearly marked as proprietary by the Architect.

Owner agrees to keep such Architect Proprietary Data confidential, to use it only for Owner's purposes and not to sell, transfer, sublicense, disclose or otherwise make available any such data to others.

Notwithstanding the preceding, Owner may disclose or otherwise make available such Architect Proprietary Data to a third party with whom Owner contracts for maintenance, operation, training, modification, repair, consultation or construction, provided that said third party agrees to be bound in writing by the limitations on use and disclosure of such data as contained herein. Owner agrees to take all reasonable action by instruction to its employees who are permitted access to Architect Proprietary Data to satisfy its obligations under this article.

Notwithstanding the preceding, this article and the restrictions on Owner contained therein, shall not apply to any data or documentation:

1.3.6.14.1 Which is in the public domain at the time it was disclosed by the Architect to Owner or at any time thereafter;

1.3.6.14.2 Which was already known to Owner at the time of disclosure to Owner by the Architect;

1.3.6.14.3 After three (3) years from the date of execution of the Agreement unless the Architect is subject to a longer restriction by a third party and Owner has agreed in writing to such longer restriction prior to use of such data or documentation;

1.3.6.14.4 Which is independently developed by Owner;

1.3.6.14.5 Which becomes known to Owner from a source other than the

Architect without breach of the Agreement by Owner;

1.3.6.14.6 Which is not marked as proprietary by the Architect; or

1.3.6.14.7 Which is not identified as proprietary by the Architect to Owner in writing prior to use of such data or documentation in the performance of the Services.

In the event of any inconsistency between the stamp or legend imprinted on information or data delivered by the Architect pursuant to the Agreement and the terms and conditions of the Agreement, the terms and conditions of the Agreement shall take precedence.

1.3.6.15 Infringement.

Royalties and fees for patents, covering designs, materials, articles, apparatus, devices, equipment or processes used in the Agreement, shall be included in the Agreement price. The Architect shall, at its own expense, hold harmless and defend Owner against any claim, suit or proceeding brought against Owner which is based upon a claim, whether rightful or otherwise, that any design, equipment, process or material or any part thereof, furnished by the Architect constitutes an infringement of any patent, copyright or trade secret and the Architect shall pay all damages and costs awarded against Owner resulting therefrom. In case said design, equipment, process or material or any part thereof, is in such suit held to constitute infringement and/or its use is enjoined, the Architect shall, at its own expense, subject to the following provisions, either procure for Owner an irrevocable, royalty-free license to continue using such design, equipment, process or material or with Owner's prior written approval, replace same with substantially equal but noninfringing equipment or systems or modify it so it becomes noninfringing, provided that no such replacement or modification shall in any way amend or relieve the Architect of its warranties and guarantees set forth in the Agreement.

This indemnity is given upon the condition that Owner shall permit the Architect to control completely the defense or compromise of any such allegation of infringement, and Owner shall render such reasonable assistance at the Architect's cost in the defense thereof as the Architect may require.

Notwithstanding any proprietary legends or copyright notices to the contrary,

Owner may copy or reproduce documents and information furnished by the Architect in connection with the Architect's proposal and with the Agreement and distribute such copies or reproduction to others for the limited purposes of design, construction, operation, consultation or maintenance. The Architect is responsible for obtaining necessary permission and releases from any third parties placing proprietary rights or copyrights on such documents or information and shall, at its own expense, hold harmless and defend Owner against any and all claims, suits or proceedings based upon a claim whether rightful or otherwise that a proprietary right or copyright has been infringed by copying, reproduction, distribution or use by Owner. Final payment to the Architect by Owner shall not be made while any such suit or claim remains unsettled.

1.3.6.16 Indemnity.

The Architect agrees to assume entire responsibility and liability, to the fullest extent permitted by law, for all damages to property and all damages or injuries to all persons, arising from, or in any manner connected with, the performance of the Services provided for in the Agreement, or occurring or resulting from the use by the Architect, its agents or employees, of materials, equipment or other property, whether the same be owned by Owner, the Architect or third parties. The Architect, to the fullest extent permitted by law, agrees to indemnify and save harmless Owner, its agents and employees from all such claims including, without limiting the generality of the foregoing, claims for which Owner may be or is alleged to be liable and legal fees and disbursements paid or incurred to enforce the provisions of this article. The Architect further agrees to obtain, maintain and pay for such general liability insurance coverage and endorsements as will ensure the provisions of this article.

1.3.6.17 Architect's Insurance.

The Architect shall purchase and maintain such insurance as shall protect the Architect and Owner from claims under Worker's Compensation acts and from claims for damages because of bodily injury, including death, and property damage which may in any way arise out of or be in any remote or proximate manner connected with the performance of the Agreement, whether such claim arises out of the act or failure to act of the Architect, Owner, or of the direct or indirect delegee, appointee or employee of either of them. This insurance shall be written in the kinds and minimum limits of liability specified below, and, except for Worker's Compensation, automobile and professional liability insurance policies, all insurance policies shall name Owner as an additional insured with cross liability endorsement:

1.3.6.17.1 Worker's Compensation Statutory, Employer's Liability Limit, in the amount of one million dollars ($1,000,000).

1.3.6.17.2 Commercial General Liability Insurance, occurrence form, providing bodily injury, personal injury, and property damage liability with combined single limits of not less than one million dollars ($1,000,000) and including Architect's Protective, Products and Completed Operations, Broad Form Property Damage with no explosion, collapse and underground (XCU) exclusions, and contractual liability coverage for the indemnity agreement contained herein.

1.3.6.17.3 Comprehensive Automobile Liability with a combined single limit of not less than one million dollars ($1,000,000).

1.3.6.17.4 Professional liability insurance in the amount of one million dollars ($1,000,000).

1.3.6.17.5 The policies described herein shall be endorsed, to the extent possible, to show that the insurers waive subrogation against Owner, its Directors, Officers and Employees.

1.3.6.17.6 Certificates of Insurance acceptable to Owner shall be filed with Owner prior to commencement of the Services. These certificates shall contain a provision that coverages afforded under the policies shall not be canceled until thirty (30) days prior written notice has been given Owner.

1.3.6.17.7 None of the insurance required hereunder shall be canceled, changed or allowed to lapse until the Agreement has been completed or until such later specified date or time which is required for certain parts of the specified coverage.

1.3.6.17.8 Insurance specified herein shall be minimum requirements and the Architect is responsible for providing any additional insurance deemed necessary to protect the Architect's interests from other hazards or claims in excess of the minimum coverage. The liability of the Architect to Owner is not limited to the Architect's insurance coverage.

1.3.6.17.9 The foregoing limit requirements may be complied with through

purchase of underlying coverage alone in the specified amounts or by obtaining lesser limits for underlying coverages and an umbrella excess liability policy bringing total cover up to the limit specified.

1.3.6.18 Limitation of Liability.

The Architect's liability for damages to Owner for any cause whatsoever whether in contract or in tort, including negligence shall be limited as follows: Five hundred thousand dollars ($500,000) for contracts of up to five hundred thousand dollars ($500,000), or twice the amount to be paid under the Agreement for contracts in excess of five hundred thousand dollars ($500,000). This limitation of liability will not apply to costs incurred or damage suffered under patents or copyrights, claims for personal injuries (including death) or damage to real or tangible personal property, or to any other claims by third parties.

1.3.6.19 Protected Activity.

The Architect agrees to comply with all federal and/or state regulations, laws or statutes which are intended to protect employees from discrimination with respect to compensation, terms, conditions or privileges of employment, including discipline and/or discharge.

The Architect acknowledges that its failure to fully comply with the requirements established by Owner regarding discrimination with respect to compensation, terms, conditions or privileges of employment, including discipline and/or discharge, could result in claims, damages, attorneys fees and/or penalties upon Owner and/or the Architect. The Architect expressly agrees to be fully responsible for the payment of any such fines or penalties whether imposed upon Owner, the Architect or both. The Architect shall indemnify and hold Owner fully harmless against any damages, fines, penalties or costs of any kind whatsoever Owner incurs as a result of the Architect's failure to fully comply with the requirements established by Owner and/or federal and/or state regulation regarding such discrimination against employees.

1.3.6.20 Equal Employment Opportunity.

The clauses found in Appendix I, Requirements Concerning Equal Employment Opportunities for Women/Minority, Veteran and Handicapped Persons, as attached hereto, are hereby incorporated into and made a part of the Agreement. The Architect

expressly agrees that in carrying out its obligations hereunder it shall fully comply with all applicable statutes, laws and regulations, including the Americans with Disabilities Act.

1.3.6.21 Independent Contractor.

The parties expressly agree that the Architect shall be an independent contractor for all purposes in the performance of the Agreement and shall not be an employee of Owner. The Architect shall exercise its independent professional judgment in the performance of the Agreement and shall not be subject to the supervision or control of Owner. Nothing herein contained shall give Owner, its officers or employees any authority to direct, supervise or control the Architect with respect to it carrying out its responsibilities hereunder.

If it is determined by a regulatory body or a court that the Architect is an employee of Owner, the Architect shall reimburse Owner for any damages or costs or penalties of any kind Owner is ordered to pay by the regulatory body or court. The parties further agree that if a regulatory body or court determines that the Architect is an employee of Owner, the Architect shall be considered to be an employee of Owner only and solely to the extent set forth in the determination of the regulatory body or court and for no other purposes.

1.3.6.22 Assignment.

The Architect shall not assign the Agreement, or any part thereof, nor delegate in whole or in part, its responsibilities hereunder, without the prior written consent of Owner. Unless otherwise stated in the written consent to an assignment, no assignment will release or discharge the assignor from any obligation under the Agreement. In case the Architect is permitted to assign monies due or to become due under the Agreement, the instrument of assignment shall be approved by Owner and shall contain a clause subordinating the claim of the assignee to all claims or liens for services rendered or materials supplied under the Agreement.

1.3.6.23 Subcontracting.

The Architect shall notify Owner, in writing, in advance of commencement of the Services, of the names of persons or entities with whom it intends to enter into subcontracts for performance of the Services. The Architect shall not retain any

Subcontractor to whom Owner reasonably objects nor shall the Architect retain any Subcontractor other than ones previously designated in the notice referred to above unless Owner approves such substitution in writing. All subcontracts shall have physically attached thereto all the applicable specifications, provisions and drawings and other Agreement documents. Each subcontract shall specifically require each Subcontractor to abide by the requirements of these General Conditions, any Special Conditions, Quality Assurance Requirements or other applicable portions of the Agreement. The Architect shall ensure that the Subcontractor abides by the schedule requirements and all other applicable obligations of the Agreement. The Architect shall be fully responsible and accountable for the acts or omissions of its employees, its Subcontractors, suppliers, subsuppliers and any persons employed by them. Nothing contained in the Agreement shall be deemed to create any contractual obligations on the part of Owner to any person or entity other than the Architect.

1.3.6.24 Warranty Concerning Prohibited Transfers.

The Architect warrants that it or its Subcontractors of any tier have not transferred and shall not transfer anything of value to any employee, agent or other representative of Owner, where such transfer is or was made with the understanding, or under circumstances indicating that it was in any way intended to obtain favorable treatment in securing the Agreement; to obtain concessions in performing the Services; or to pay for such business secured or concessions obtained in the past.

1.3.6.25 Publicity and Photographs.

The Architect shall not make any announcement or release any information, publicity or photographs concerning the Agreement or the Project or any part thereof to any member of the public, press or any official body, unless prior written consent is obtained from Owner, except that information may be given to an official body as required by law or regulation to obtain necessary permits.

1.3.6.26 Notices.

All notices which the Architect is either required or authorized to give under the terms of the Agreement shall be deemed to have been sufficiently given to Owner if given by registered or certified mail, addressed to:

Brad Zuehlke
Seren Innovations, Inc.
10 South 5th Street, Suite 840
Minneapolis, Minnesota 55402

All notices which Owner is either required or authorized to give under the terms of the Agreement shall be deemed to have been sufficiently given to the Architect if given by registered or certified mail, addressed to the Architect's address on the Purchase Order.

Nothing contained in this article shall be construed to restrict the transmission of routine communications between representatives of the Architect and Owner.

1.3.6.27 Article Headings.

Article headings and titles are included for the convenience of the parties and shall not be used to construe the meanings of the terms and conditions hereof.

1.3.6.28 Waiver.

The failure of one party to insist upon or enforce, in any instance, strict performance by the other party of any of the terms of the Agreement, including those relating to compensation or to the exercise of any right herein conferred, shall not be construed as a waiver or relinquishment to any extent of its right to assert or rely upon such terms or rights on any future occasion.

1.3.6.29 Severability.

In the event that any words, phrase, clause, sentence or other provision hereof shall violate any applicable statute, ordinance or rule of law in any jurisdiction in which it is used, such provision shall be ineffective to the extent of such violation without invalidating any other provision hereof.

**1.3.7 TERMINATION FOR CONVENIENCE**

The Owner may, at its option, terminate the Agreement in whole or in part at any time by written notice thereof to the Architect, whether or not the Architect is in default. Upon any such termination under this provision, the Architect agrees that it shall have

no claim for damages (including, without limitation, loss of anticipated profits) on account thereof. The sole right and remedy of the Architect shall be payment in accordance with this provision, provided that those provisions of the Agreement which by their very nature survive the Owner's written acceptance of all services provided based on a final inspection under the Agreement shall remain in full force and effect after such termination.

1.3.7.1 Upon receipt of a notice of termination under this provision, the Architect shall, unless the notice requires otherwise:

1.3.7.1.1 Immediately discontinue Services (including the removal of personnel from the Owner's premises on the date and to the extent specified in the notice; and

1.3.7.1.2 Deliver to Owner all reports, plans, drawings, specifications, data, estimates, summaries or other material and information whether completed or in process, accumulated by the Architect in performance of the Services.

1.3.7.2 Upon any termination under this provision, the Owner shall pay to the Architect all amounts due and not previously paid to the Architect for all services satisfactorily completed in accordance with the Agreement prior to such notice and for services thereafter completed as specified in such notice. No amount shall be allowed for anticipated profits on unperformed services or overhead.

1.3.8 **TERMINATION FOR DEFAULT**

1.3.8.1 The Owner may, by written notice of default to the Architect terminate the whole or any part of the Agreement in any one of the following circumstances:

1.3.8.1.1 If the Architect fails to perform any of its obligations under the Agreement, or fails to make progress so as to significantly endanger timely completion or performance of the Agreement in accordance with its terms and the Architect does not commence significant action to cure such failure within five (5) days after receipt of written notice from the Owner.

1.3.8.1.2 If the Architect should become insolvent or unable to meet its payroll or other current obligations, or be adjudicated a bankrupt, have an involuntary Petition in Bankruptcy filed against it, make an assignment for benefit of

creditors, file a petition for an arrangement, composition or compromise with its creditors under any applicable laws, or have a trustee or other officer appointed to take charge of its assets.

1.3.8.2 In the event the Owner terminates the Agreement in whole or in part under provision, the Owner may, at its option, take over and arrange for completion of the services. The Architect shall be liable to the Owner for all additional costs incurred by the Owner for the completion of performance of the Services.

1.3.8.3 Upon receipt of a notice of termination for default under this provision, the Architect shall forthwith:

1.3.8.3.1 Immediately discontinue the Services on the date and to the extent specified in the notice; and

1.3.8.3.2 Deliver to the Owner all reports, plans, drawings, specifications, data, estimates, summaries or other material and information whether completed or in process, accumulated by the Architect in performance of the Services.

1.3.8.4 If after written notice of termination of the Agreement by the Owner under this provision, it is determined by a factfinder for any reason that the Architect was not in default under this provision, or that the default was excusable under the provisions of th Agreement, the Architect's sole remedy shall be the same as if the written notice had been issued pursuant to the Termination for Convenience provision herein.

1.3.8.5 The rights and remedies of the Owner set forth in this provision shall be cumulative with and in addition to the rights and remedies otherwise provided at law or equity under the Agreement. No failure to exercise or delay in exercising on the part of the Owner of any right provided by the Architect shall operate as a waiver thereof.

1.3.9 **PAYMENTS TO THE ARCHITECT**

1.3.9.1 Payments for conforming Services rendered by the Architect as per completed function (Exhibit B) shall be made per invoicing unit in the Architect's appropriately documented statement to Owner. Payment term is net 30 days. Progress payments may be made on functions and activities that cannot be completed in within two months of start date or for activities that are delayed or suspended for reasons beyond the Architect's control.

1.3.9.2 Payments otherwise due to Architect may be withheld on account of nonconforming Services not properly remedied, claims made or liens filed, damage by the Architect to the Owner or others not adjusted, or the Architect's failure to make payments to is subcontractors, suppliers or consultants, or any other failure to perform the Agreement in accordance with its terms. All Architect statement/invoices shall reference this Agreement and any other applicable reference numbers and shall contain a complete description of all charges in the format requested by the Owner. If the Architect owes any monies to a division, subsidiary or related entity of the Owner, the Owner may reduce any amounts due hereunder by like amount.

In making payments hereunder, the Owner shall be entitled to conclusively presume that payment information provided by the Architect such as name, account number(s) and name of payee is accurate. In no event shall Owner make a second payment where the first payment is made in accordance with such Architect furnished information. All payments shall be in U.S. currency.

**ARTICLE 1.4 SCOPE OF SERVICES AND OTHER SPECIAL TERMS AND CONDITIONS**

1.4.1 Enumeration of Parts of the Agreement. This Agreement represents the entire and integrated agreement between the Owner and the Architect and supersedes all prior negotiations, representations or agreements, either written or oral. This Agreement may be amended only by written instrument signed by both Owner and Architect. This Agreement comprises the documents listed below.

1.4.1.1 Standard Form of Agreement Between Owner and Architect, AIA Document B141-1997 as modified.

1.4.1.2 Standard Form of Architect's Services: Design and Agreement Administration, AIA Document B141-1997, or as follows:

See attached Exhibit A entitled "Architect's Scope of Work". It is the intention of the Owner and Architect to have Exhibit A complement, supplement and more fully describe the Services identified and described on page 2 of the Agreement.

1.4.1.3 Other documents as follows:
Exhibit B – Architect's price schedule

Exhibit C – Change order Authorization Form
Exhibit D – Contract Schedule
Exhibit E – General Engineering Workflow (Quality Control Procedures)
Exhibit F – Project Boundaries

1.4.2 Special Terms and Conditions. Special terms and conditions that modify this Agreement are as follows:

Should anything necessary for a clear understanding of the Services be omitted from the Agreement or should any requirements thereof appear to conflict, **NO MATTER HOW SEEMINGLY INSIGNIFICANT** the apparent omission or conflict, the Architect shall promptly upon discovery thereof, so notify the Owner in writing and shall secure written instructions from the Owner before proceeding with the Services affected thereby.

ARTICLE 1.5 **COMPENSATION**

Services properly provided and/or successfully achieved under this Agreement shall be paid for by the price described in attached Exhibit B. The Architect has used its best professional judgment to arrive at the estimates contained in Exhibit B and the Owner is reasonably entitled to rely on these estimates. Owner will pay for rework only for reasons other than Architects fault or negligence. In no event shall the Agreement Amount exceed $433,141 without a written Change Order.

This Agreement entered into as of the day and year first written above.

| | |
|---|---|
| [signature] | [signature] |
| **OWNER** *(signature)* | **ARCHITECT** *(signature)* |
| Glynis A. Hinschberger<br>President & CEO | Giuseppe De Harold – Managing Director |
| *(Printed name and title)* | *(Printed name and title)* |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# BLANKET ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS

This endorsement modifies insurance provided under the following
COMMERCIAL GENERAL LIABILITY COVERAGE PART

PROVISIONS:

1. WHO IS AN INSURED (SECTION II) is amended to include as an insured any person or organization (called hereafter additional insured) whom you have agreed in a written contract, executed prior to loss, to name as additional insured, but only with respect to liability arising out of "your work" or your ongoing operations for that additional insured performed by you or for you.

2. With respect to the insurance afforded to Additional Insureds the following conditions apply:

   a. Limits of Insurance - The following limits of liability apply:

      1. The limits which you agreed to provide; or

      2. The limits shown on the declarations,

      whichever is less.

   b. This insurance is excess over any valid and collectible insurance unless you have agreed in a written contract for this insurance to apply on a primary or contributory basis.

3. This insurance does not apply:

   a. on any basis to any person or organization for whom you have purchased an Owners and Contractors Protective policy.

   b. to "bodily injury," "property damage," "personal injury," or "advertising injury" arising out of the rendering of or the failure to render any professional services by or for you, including:

      1. The preparing, approving or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications, and

      2. Supervisory, inspection or engineering services.

EXHIBIT

B



Copyright, The Travelers Indemnity Company, 1994.
Includes Copyrighted Material from Insurance Services Office, Inc.

STATE OF MINNESOTA )
) ss.
COUNTY OF RAMSEY )

**AFFIDAVIT OF SERVICE**

Cheryl A. Miller, being duly sworn, deposes and states that on July 1, 2005, she served the following:

Defendants The Travelers Indemnity Company of America and Travelers Property Casualty Company of America f/k/a The Travelers Indemnity Company of Illinois' Requests for Admission, Integrated Interrogatories and Integrated Request for Production of Documents to Seren Innovations, Incorporated, Transcontinental Insurance Company and Continental Casualty Company

upon:

JEROME B ABRAMS ESQ
ABRAMS & SMITH
12TH FLOOR PILLSBURY CENTER SOUTH
220 SOUTH SIXTH ST
MINNEAPOLIS MN 55402

MATTHEW R WILDERMUTH ESQ
MECKLER BULGER & TILSON LLP
123 N WACKER DR STE1800
CHICAGO IL 60606

by fax and depositing a true and correct copy thereof in the United States Mail with postage prepaid thereon.

Cheryl A. Miller

Subscribed and sworn to before me
on July 1, 2005.

Notary Public

MICHELLE DIANE BONK
Notary Public-Minnesota
My Commission Expires Jan 31, 2008

655251

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Seren Innovations, Incorporated, Transcontinental Insurance Company, and Continental Casualty Company,

Plaintiffs,

vs.

The Travelers Indemnity Company of America, The Travelers Indemnity Company of Illinois, and Does 1-10,

Defendants.

Court File No. 04-cv-4978

---

**DEFENDANTS TRAVELERS' REQUEST FOR PRODUCTION OF DOCUMENTS TO PLAINTIFF SEREN INNOVATIONS, INCORPORATED**

---

TO: Plaintiff Seren Innovations, Incorporated and its attorney, Jerome B. Abrams, Abrams & Smith, 12th Floor Pillsbury Center South, 220 South Sixth Street, Minneapolis, MN 55402.

**PLEASE TAKE NOTICE,** that Defendants Indemnity Company of America and Travelers Property Casualty Company of America f/k/a The Travelers Indemnity Company of Illinois (hereinafter "Travelers") hereby requests, pursuant to Rule 34 of the Minnesota Rules of Civil Procedure, that Plaintiff Seren Innovcations, Incorporated (hereinafter "Seren") above-named produce the documents requested herein for inspection and copying to Murnane, Conlin, White & Brandt, 444 Cedar Street, Suite 1800, St. Paul, Minnesota 55101, within the time provided by the Rule.

This request is deemed to be continuing, and should you, your attorneys or agents obtain any other documents which would add to or change the documents supplied by you, you are directed, pursuant to the Rules of the Minnesota Rules of Civil

EXHIBIT
tabbles
2

Procedure, to give timely notice of such information and to furnish such additional documents without delay.

The term "document" shall have the definition set forth in the Interrogatories served herewith.

**DOCUMENT REQUESTS**

1. Copies of any and all *Miller-Shugart* settlement agreements between Seren and any plaintiff or claimant seeking damages against Seren as a result of the December 11, 1998 St. Cloud gas explosion.

2. Copies of any other settlement agreements between Seren and any plaintiff or claimant seeking damages from Seren as a result of the December 11, 1998 St. Cloud gas explosion.

3. Copies of all policies of insurance including, but not limited to, federal liability, professional liability or excess/umbrella coverage for Seren potentially giving rise to coverage for Seren as a result of the December 11, 1998 St. Cloud gas explosion.

4. A copy of all attorney's fees and invoices for all lawsuits or claims against Seren arising out of the December 11, 1998 St. Cloud gas explosion.

5. Copies of all invoices for costs and disbursements incurred by Seren as a result of defending lawsuits or claims brought against it following the December 11, 1998 St. Cloud gas explosion case.

6. A copy of all payments that have been made on behalf of Seren by any insurance carrier for attorney's fees, costs and disbursements incurred by Seren in the St. Cloud gas explosion case.

7. An itemization of all damages for which Seren is seeking reimbursement from Travelers in this case.

8. Copies of any contractual agreements between Seren and Sirti Limited Corp. relating to the applicability or enforceability of contractual indemnity provisions.

9. Copies of all documentation or itemization of defense and indemnification costs spent by Seren in defending/indemnifying it as a result of the December 11, 1998 St. Cloud gas explosion case.

10. Copies of all letters, memoranda, emails or any other communications between any Seren representatives, agents, experts or otherwise and its attorneys, law

firm or any other persons, regarding Seren's potential or realistic exposure or percentage of fault to which Seren cold be attributed or apportioned should this case go to trial, or for use in settlement negotiations, mediations or otherwise.

11. Copies of all documents evaluating damages or value of each of the Plaintiff's claims in the underlying lawsuit.

12. Any documents upon which you referred to or relied upon in responding to the Interrogatories.

DATED: 7/18/05

MURNANE, CONLIN, WHITE & BRANDT
PROFESSIONAL ASSOCIATION

Daniel A. Haws #193501
Attorneys for Defendant The Travelers Indemnity Company of America and Travelers Property Casualty Company of America f/k/a The Travelers Indemnity Company of Illinois
444 Cedar Street, Suite 1800
St. Paul, MN 55101
(651) 227-9411

654350

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Seren Innovations, Incorporated, Transcontinental Insurance Company, and Continental Casualty Company,

Plaintiffs,

vs.

The Travelers Indemnity Company of America, The Travelers Indemnity Company of Illinois, and Does 1-10,

Defendants.

Court File No. 04-cv-4978

---

**DEFENDANTS TRAVELERS' INTERROGATORIES TO PLAINTIFF SEREN INNOVATIONS, INCORPORATED**

---

TO: Plaintiff Seren Innovations, Incorporated and its attorney, Jerome B. Abrams, Abrams & Smith, 12th Floor Pillsbury Center South, 220 South Sixth Street, Minneapolis, MN 55402.

Pursuant to the provisions of Rule 33 of the Minnesota Rules of Civil Procedure, Defendant Travelers Indemnity Company of America, The Travelers Indemnity Company of Illinois (hereinafter "Travelers") requests and requires Plaintiff Seren Innovations, Incorporated (hereinafter "Seren") to submit written Answers, under oath, to the following Interrogatories within the time provided in the Rule. These Interrogatories are hereby expressly made continuing, requiring supplemental Answers thereto as information is acquired through the time of trial.

INSTRUCTIONS AND DEFINITIONS

When the following terms or names are used, the Defendants intend the meanings hereinafter described to be associated with such terms and names.

1. The singular includes the plural and the plural includes the singular where appropriate to the sense of the Interrogatory.

2. As used herein, "document" shall mean, without limitation, every writing or record of every type and description that is or has been in your possession, control or custody, or of which you have knowledge, including without limitation, correspondence, memoranda, tapes, stenographic or handwritten notes, certificates, receipts, photographs, films, voice recordings, graphs, reports, minutes or statistical computations, agreements, negotiations, or statements; every copy of such writing or record where the original is not in your possession, control or custody to whom this request is directed and every copy of every such writing or record where such copy is not an identical copy of an original or where such copy contains any commentary or notations whatsoever that does not appear on the original.

3. "Identify" or "identity" when used in reference to:

   a. an individual, shall mean to state his/her full name, present or last known residential address, and present or last known employment position or business affiliation, indicating name of company, job title, employment address, and telephone numbers;

   b. a firm, partnership, corporation, proprietorship, association or other organization or entity shall mean to state its full name, present or last known address and telephone number (designating which, the legal form of such entity or organization, and the identity of its chief executive officer);

   c. a "document" shall mean to state, if applicable, the date of the document, the name of the person who prepared the document, the name of the recipient of the document, and the subject matter of the document; and

   d. "date" shall mean the exact date, month and year, if ascertainable, or if not, the best available approximation including relationship to other events.

4. "St. Cloud gas explosion" shall mean the gas explosion that occurred on December 11, 1998 in St. Cloud, Minnesota.

5. "Lawsuit" shall mean any lawsuit filed in connection with the St. Cloud gas explosion on December 11, 1998.

6. "Claim" shall mean any claims brought in connection with the St. Cloud gas explosion on December 11, 1998.

## INTERROGATORIES

1. Identify which claims asserted by the respective plaintiffs and/or claimants against Seren relate to professional versus non-professional services.

2. Itemize by each lawsuit commenced against Seren, the amount of defense fees, costs and disbursements incurred to defend the lawsuit.

3. Itemize by each claim commenced against Seren, the amount of defense fees, costs and disbursements incurred to defend the claim.

4. Identify all payments made by any insurance carrier on behalf of Seren for any of the lawsuits or claims asserted against Seren as a result of the December 11, 1998 St. Cloud gas explosion.

5. Identify the total amount of money Seren has spent in defense costs and in defending Seren in claims and lawsuits involving the December 11, 1998 St. Cloud gas explosion.

6. Identify the total amount of money Seren has spent in indemnification costs and in defending Seren in claims and lawsuits involving the December 11, 1998 St. Cloud gas explosion.

7. For each plaintiff and/or claimant who received indemnification dollars from Seren, identify which sum Seren paid to plaintiffs and/or claimants for professional services and which indemnification dollars were paid for professional services and which indemnification dollars were paid for non-professional services.

8. Identify whether there is any contractual agreement either verbal or in writing between Seren and Sirti Limited Corp. relating to applicability or enforceability of the contractual indemnity provisions.

9. Identify the percentage of fault which you believe Seren would or should have had apportioned to it for its conduct in connection with the incident or occurrences leading up to and allegedly causing or resulting in the explosion giving rise to the underlying claims.

10. Provide copies of all letters, emails, memoranda or other such documents which incorporate any kind of opinion or analysis by Seren, its representatives, lawyers, counsel or anyone else, of:

    a. Seren's potential exposure to the underlying Plaintiffs for their liability claims, including evaluations of percentages of fault, likelihood of success in defending the claims on the merits, or any similar such document;

b. The damage value , or reasonable and realistic value of each and every claim for which Seren entered into, or has negotiated to enter into Settlement Agreements with Plaintiffs; *Miller-Shugart* or otherwise.

DATED: 7/12/05.

MURNANE, CONLIN, WHITE & BRANDT
PROFESSIONAL ASSOCIATION

Daniel A. Haws #193501
Attorneys for Defendant The Travelers Indemnity Company of America and Travelers Property Casualty Company of America f/k/a The Travelers Indemnity Company of Illinois
444 Cedar Street, Suite 1800
St. Paul, MN 55101
(651) 227-9411

653893

STATE OF MINNESOTA)
) SS
COUNTY OF RAMSEY )

AFFIDAVIT OF SERVICE
BY FAX AND U.S. MAIL

Victoria E. Bauer, being first duly sworn, deposes and states that on the 18th day of July, 2005, she served the attached Defendant The Travelers Indemnity Company of America's Interrogatories to Plaintiff Seren Innovations, Inc. and Defendant The Travelers Indemnity Company of America's Request for Production of Documents to Plaintiff Seren Innovations, Inc. upon:

JEROME B ABRAMS ESQ
ABRAMS & SMITH
12TH FLOOR PILLSBURY CENTER SOUTH
220 SOUTH SIXTH STREET
MINNEAPOLIS MN 55402

MATTHEW R WILDERMUTH ESQ
MECKLER BULGER & TILSON LLP
123 N WACKER DR STE 1800
CHICAGO IL 60606

by faxing and depositing true and correct copies thereof in the United States Mail with postage prepaid thereon.

Victoria E. Bauer

On this 18th day of July, 2005, before me a Notary Public within and for said County, personally appeared Victoria E. Bauer, to me known to be the person described in and who executed the foregoing affidavit of service and acknowledged that she executed the same as her free act and deed.

CHERYL ANN MILLER
Notary Public
Minnesota
My Commission Expires January 31, 2008

Notary Public

MURNANE
BRANDT

September 8, 2005

***Reply to St. Paul***

MATTHEW R WILDERMUTH ESQ
LYNNETTE STAFFORD ESQ
MECKLER BULGER & TILSON LLP
123 N WACKER DR STE1800
CHICAGO IL 60606

JEROME B ABRAMS ESQ
ABRAMS & SMITH
12TH FLOOR PILLSBURY CENTER SOUTH
220 SOUTH SIXTH ST
MINNEAPOLIS MN 55402

Re: Seren Innovations, Incorporated, Transcontinental Insurance Company, and Continental Casualty Company v. The Travelers Indemnity Company of America, The Travelers Indemnity Company of Illinois, and Does 1-10
Our File No. 46327

**SENT BY FAX AND U.S. MAIL**

Dear Counsel:

You were served with Interrogatories and Request for Production of Documents on July 18, 2005. Your answers are long past due. You advised the Court that you would provide these documents to us prior to the settlement conference in order to facilitate settlement negotiations. However, you have failed to comply with this Court Order and still have not provided the documents at this late date.

We will be filing a motion to compel promptly. We ask that you please provide us with answers to interrogatories and complete responses to request for documents, as well as answers to the questions raised in the various letters that I sent to Jerry Abrams and in discussions with Lynette Stafford over the past few months. Thank you.

Additionally, your responses to request for admissions were inadequate and incomplete. I sent you a letter on August 16 setting forth many of these inadequacies. I expect that you will answer all of the request for admissions and integrated interrogatories and document requests fully and completely prior to our motion to compel.

Sincerely,

Daniel A. Haws/veb

Daniel A. Haws
Attorney at Law
dhaws@murnane.com
DAH/veb/668832

EXHIBIT
tabbles
3

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | | |
|---|---|---|
| SEREN INNOVATIONS, INCORPORATED, TRANSCONTINENTAL INSURANCE COMPANY, and CONTINENTAL CASUALTY COMPANY, | ) | |
| Plaintiffs, | ) | COURT FILE NO.: 04-CV-4978 (JMR-FLN) |
| v. | ) | |
| THE TRAVELERS INDEMNITY COMPANY OF AMERICA, THE TRAVELERS INDEMNITY COMPANY OF ILLINOIS, and DOES 1-10, | ) | |
| Defendant. | ) | |

**PLAINTIFFS' OBJECTIONS AND RESPONSES**
**TO DEFENDANTS' REQUESTS FOR ADMISSION**

Plaintiffs TRANSCONTINENTAL INSURANCE COMPANY, CONTINENTAL CASUALTY COMPANY and SEREN INNOVATIONS, INCORPORATED (collectively, "Plaintiffs"), by and through their undersigned counsel, state as follows for their objections and responses to the Requests for Admission, Integrated Interrogatories and Integrated Request for Production of Documents ("Requests") propounded by Defendants THE TRAVELERS INDEMNITY COMPANY OF AMERICA and THE TRAVELERS INDEMNITY COMPANY OF ILLINOIS (collectively, "Travelers"):

EXHIBIT
tabbles
4

**OBJECTIONS AND RESPONSES TO REQUESTS FOR ADMISSION**

1. Admit that Seren Innovations, Inc. ("Seren") is an additional insured or insured entitled to coverage for the claims alleged against it in the St. Cloud gas explosion litigation which is the subject of this lawsuit under policies of insurance issued by Transcontinental Insurance Company ("TIC") and Continental Casualty Company ("Continental").

**RESPONSE TO REQUEST NO. 1:** Plaintiffs object to this Request on the grounds that it is vague, overly broad, seeks a legal conclusion and demands information that is subject to the work-product privilege. Subject to and without waiving their objections, Plaintiffs admit that Transcontinental Insurance Company ("Transcontinental") and Continental Casualty Company ("Continental Casualty") paid amounts on behalf of Seren Innovations, Incorporated ("Seren") in respect of damages resulting from a natural gas explosion that occurred in St. Cloud, Minnesota on December 11, 1998 (the "St. Cloud Explosion") for claims covered under a general liability insurance policy that Transcontinental issued to Cable Constructors Incorporated ("CCI"), which policy is designated Policy No. L1342879 and was effective from May 1, 1998 through May 1, 1999 (the "Transcontinental Policy") and an excess liability insurance policy that Continental issued to CCI, which policy is designated Policy No. L155703061 and was effective from May 1, 1998 through May 1, 1999 (the "Continental Casualty Policy"). Subject to and without waiving their objections, Plaintiffs further admit that Plaintiffs made such payments on the basis that Seren was an additional insured under the Transcontinental and Continental Policies. Plaintiffs further state that in connection with such payments, Transcontinental and Seren entered into a loan receipt agreement executed on May 20, 2000 pursuant to which Transcontinental loaned Seren defense fees and costs to assist Seren in defending itself against claims asserted in multiple lawsuits that were brought against Seren for damages resulting from the St. Cloud Explosion (hereinafter the "Loan Receipt Agreement").

2. Admit that Transcontinental Insurance Company and Continental Casualty Company owed Seren an independent duty to defend claims brought against Seren in the St. Cloud gas explosion litigation.

**<u>RESPONSE TO REQUEST NO. 2:</u>** Plaintiffs object to this Request on the grounds that it is vague, overly broad, seeks a legal conclusion and demands information that is subject to the work-product privilege. Subject and without waiving their objections, Plaintiffs admit that Transcontinental loaned Seren defense fees and costs pursuant to the Loan Receipt Agreement to assist Seren in defending itself against claims asserted in multiple lawsuits brought against Seren for damages resulting from the St. Cloud Explosion. Subject to and without waiving their objections, Plaintiffs further admit that Transcontinental had a duty to defend Seren until it exhausted its limit of liability under the Transcontinental Policy through the payment of covered claims. Transcontinental denies that this duty was "independent" to the extent Travelers also owed a defense to Seren under the Travelers Primary Policy. Continental Casualty admits that it assumed Seren's defense under the Continental Casualty Policy once the Transcontinental Policy was exhausted because it had an obligation to do so under the terms and conditions of the Continental Casualty Policy. Continental Casualty denies that its obligation to defend Seren was "independent" to the extent Travelers also owed a defense to Seren under the primary liability insurance policy issued by Travelers Indemnity Company of America to Sirti, which policy was effective from January 1, 1998 through January 1, 1999 and is designated Policy No. DT-CO-368X347-TIA-98 (the "Travelers Primary Policy").

3. Admit that attached hereto as Exhibit A is a complete copy of the AIA Document B141-1997 Standard Form of Agreement Between Owner and Architect entered into between Seren Innovations, Inc. and Sirti Limited Corp. ("Sirti") made as of March 10, 1998 ("Agreement").

**<u>RESPONSE TO REQUEST NO. 3:</u>** Denied.

4. Admit that the Agreement between Seren and Sirti is the only document wherein Sirti contractually agreed to provide any indemnity to Seren for the St. Cloud project.

**RESPONSE TO REQUEST NO. 4:** Denied.

5. Admit that the specific indemnity agreement entered into between Seren and Sirti is contained on page 16 of the Agreement at Section 1.3.6.16 Indemnity.

**RESPONSE TO REQUEST NO. 5:** Denied.

6. Admit that the indemnity provision in the Agreement does not require Sirti to defend Seren for any claims made against it, nor does it require Sirti to pay any defense fees or expenses incurred in defending Seren for claims made against it.

**RESPONSE TO REQUEST NO. 6:** Denied.

7. Admit that attached hereto as Exhibit B is a true and accurate copy of the Additional Insured Endorsement contained on Sirti's Commercial General Liability Policy with Travelers ("Additional Insured Endorsement").

**RESPONSE TO REQUEST NO. 7:** Plaintiffs admit that the document designated Exhibit B and attached to Travelers' Requests for Admission appears to be a copy of one of the two additional insured endorsements attached to the Travelers Primary Policy.

8. Admit that the Additional Insured Endorsement identifies an insured as follows:

> **WHO IS AN INSURED** (Section II) is amended to include any person or organization you are required by written contract to include as an insured, ***but only with respect to liability arising out of "your work." This coverage does not include liability arising out of the Independent acts or omissions of such person or organization. The written contract must be executed prior to the occurrence of any Loss.***
>
> ...

**RESPONSE TO REQUEST NO. 8:** Plaintiffs admit that the endorsement attached to Travelers Requests and designated Exhibit B includes the text quoted above but states that there is no bolding or italicized font included in the quoted provision of the attached copy of the Endorsement.

9. Admit that the terms "you" and "your work" as used in this blanket Additional Insured Endorsement refer specifically to Sirti, and not Seren.

**RESPONSE TO REQUEST NO. 9:** Plaintiffs object to this request on the grounds that it seeks a legal conclusion, is vague, is ambiguous, seeks information that is protected from disclosure by the work-product privilege and is not reasonably calculated to lead to the discovery of admissible evidence in accordance with the Federal Rules of Civil Procedure. Subject to and without waiving their objections, Plaintiffs admit that the terms "you" and "your work" in the Endorsement designated Exhibit B and attached to Travelers' Requests refer to Sirti and any other named insureds under the Travelers Primary policy.

10. Admit that pursuant to the clear and unambiguous terms of the Additional Insured Endorsement, the Additional Insured Endorsement does not provide coverage for liability arising out of the independent acts or omissions of Seren.

**RESPONSE TO REQUEST NO. 10:** Denied.

11. Admit that the only coverage Seren could claim as an additional insured under Travelers' insurance policy is for the vicarious liability claims that could be made against Sirti.

**RESPONSE TO REQUEST NO. 11:** Denied.

12. Admit that Seren has no vicarious liability exposure for any acts or negligence of Sirti, as Seren has resolved all claims made against it with any potential claimants in separate agreements which specifically preserved any of claimants or Plaintiffs' claims against Sirti.

**RESPONSE TO REQUEST NO. 12:** Denied.

13. Admit that the Additional Insured Endorsement includes an exclusion for liability "arising out of the rendering of or the failure to render any professional services" as defined in Paragraph 4 of the blanket Additional Insured Endorsement attached hereto as Exhibit B ("Professional Services Exclusion to Additional Insured Endorsement").

**RESPONSE TO REQUEST NO. 13:** Plaintiffs admit that Exhibit B contains the language quoted in this Request.

14. Admit that the professional services exclusion to the Additional Insured Endorsement precludes coverage to Seren for any and all Claims arising out of either Sirti or Seren's professional services provided on the St. Cloud project.

**RESPONSE TO REQUEST NO. 14:** Denied.

15. Admit that Seren has no documentation or evidence to establish indemnity payments made by Seren, or anyone on its behalf, to settle claims made by Plaintiffs for Seren's exposure specifically or independently, as opposed to settlements made jointly by Seren and Cable Contractors Inc. ("CCI").

**RESPONSE TO REQUEST NO. 15:** Denied.

16. Admit that any settlement agreement reached between plaintiffs or claimants and Seren included amounts or payments which extinguished or released plaintiffs' claims for punitive damages against Seren.

**RESPONSE TO REQUEST NO. 16:** Denied.

17. Admit that Seren did not segregate or relocate [sic] any specific amounts of its settlements with plaintiffs to punitive damages, independent acts and negligence by Seren or any vicarious liability exposure to Seren for the acts of Sirti.

**RESPONSE TO REQUEST NO. 17:** Denied.

18. Admit that Transcontinental Insurance Company ("Transcontinental") and Continental Casualty Company ("Continental") issued insurance policies to CCI which provided general liability insurance coverage to both CCI (as an insured) and Seren (as an additional insured) for property damage and bodily injury claims made against CCI and Seren arising out of the St. Cloud gas explosion.

**RESPONSE TO REQUEST NO. 18:** Plaintiffs object to this Request on the grounds that it seeks a legal conclusion, is vague, is ambiguous and demands information that is not subject to disclosure based on the work-product privilege. Subject to and without waiving their objections, Transcontinental admits that it is the legal entity with responsibility for claims asserted under the Transcontinental Policy. Continental Casualty admits that it is the sole legal entity with responsibility for claims asserted under the Continental Casualty Policy. Transcontinental and Continental Casualty further admit that the respective amounts they paid on behalf of Seren for damages resulting from the St. Cloud Explosion and for which they seek contribution from

Travelers in this action were in respect of claims covered under the Transcontinental and Continental Casualty Policies. Plaintiffs deny that all amounts sought/demanded by the plaintiffs/claimants in the underlying actions qualified for coverage under the Transcontinental or Continental Casualty Policies. As a result, Continental Casualty and Transcontinental made no payments on behalf of Seren or CCI in respect of amounts for which no coverage was afforded under the respective policies they issued to CCI.

19. Admit that Seren was an additional insured under a Commercial General Liability Policy issued by Transcontinental and Continental to CCI.

**RESPONSE TO REQUEST NO. 19:** Plaintiffs object to this Request on the grounds that it seeks a legal conclusion and demands information that is protected from disclosure by the attorney-client and work-product privileges. Subject to and without waiving their objections, Plaintiffs admit that Seren qualified as an additional insured under the Transcontinental and Continental Casualty Policies subject to the terms and conditions of coverage provided therein.

20. Admit that Transcontinental and Continental had a duty to provide a defense and indemnity as the primary insurance carrier of Seren under an additional insured endorsement in CCI's insurance policies.

**RESPONSE TO REQUEST NO. 20:** Plaintiffs object to this Request on the grounds that it is vague, overly broad, seeks a legal conclusion and demands information that is subject to the work-product privilege. Subject and without waiving their objections, Plaintiffs state that Transcontinental loaned Seren defense fees and costs pursuant to the Loan Receipt Agreement to assist Seren in defending itself against claims asserted in multiple lawsuits brought against Seren for damages resulting from the St. Cloud Explosion. Plaintiffs admit that Transcontinental had a duty to defend Seren until such time as it exhausted its limit of liability through the payment of covered claims under the Transcontinental Policy. Transcontinental denies that this duty was "independent" or "primary" to the extent Travelers also owed a defense to Seren under the

Travelers Primary Policy. Continental Casualty admits that it assumed Seren's defense under the Continental Casualty Policy once the Transcontinental Policy was exhausted because it had an obligation to do so under the terms and conditions of the Continental Casualty Policy. Continental Casualty denies that its obligation to defend Seren was "independent" or "primary" to the extent Travelers also owed a defense to Seren under the Travelers Primary Policy.

21. Admit that Seren had a Commercial General Liability policy of insurance that it obtained on its own behalf which provided coverage for the benefit of Seren for those claims made against Seren for bodily injury and property damage arising out of the St. Cloud gas explosion litigation.

**RESPONSE TO REQUEST NO. 21:** Plaintiffs object to this Request on the grounds that it seeks a legal conclusion and demands information that is protected from disclosure by the attorney-client and work-product privileges. Subject to and without waving their objections, Plaintiffs admit that Seren had in effect at the time of the St. Cloud Explosion a general liability insurance policy which, under certain conditions, provided coverage to Seren in respect of bodily injury or property damage claims for which Seren was legally liable, including, potentially, claims arising out of the St. Cloud Explosion.

22. Admit that Seren's own insurance company had a duty to provide a defense and indemnity for any and all claims for bodily injury or property damage made against Seren as its primary commercial general liability insurance carrier for claims arising out of the St. Cloud gas explosion.

**RESPONSE TO REQUEST NO. 22:** Denied.

23. Admit that Travelers' Additional Insured Endorsement specifically provides, in pertinent part, as follows:

> 1. With respect to the insurance afforded to the Additional Insureds, the following conditions apply;
>
> a. Limits of Insurance - The following limits of liability apply
>
> 1. The limits which you agreed to provide or
> 2. The limits shown on the declarations.

Whichever is less.

b. This insurance is excess over any valid and collectible insurance unless you have agreed in a written contract for this insurance to apply on a primary or contributory basis.

**RESPONSE TO REQUEST NO. 23:** Plaintiffs admit that the Endorsement which is designated Exhibit B and is attached to Travelers' Requests includes the provision(s) stated in the Request.

24. Admit that pursuant to the clear and unambiguous terms of the Travelers Additional Insured Endorsement, any coverage that could arguably provide coverage to Seren as an additional insured under the blanket Additional Insured Endorsement would be deemed excess to any other insurance which provided coverage to Seren.

**RESPONSE TO REQUEST NO. 24:** Denied.

25. Admit that pursuant to the clear and unambiguous terms of the blanket Additional Insured Endorsement issued by Travelers to Sirti, Travelers does not owe Seren any duty to defend any Claims brought against Seren as a result of the St. Cloud gas explosion.

**RESPONSE TO REQUEST NO. 25:** Denied.

26. Admit that the only policy against which Seren claims it is an additional insured is the Commercial General Liability policy issued by Travelers Property Casualty which includes an additional insured endorsement with policy limits of $1,000,000.00, all of which coverage is defined by the terms and conditions set forth in the entirety of the Commercial General Liability policy.

**RESPONSE TO REQUEST NO. 26:** Denied.

27. Admit that neither Seren, nor its other insurance carriers, are making any claim for coverage under the Umbrella (excess) policy of insurance issued by Travelers to Sirti.

**RESPONSE TO REQUEST NO. 27:** Denied.

28. Admit that Seren has not incurred any of its own out of pocket expenses or attorney's fees in defending the claims in the St. Cloud gas explosion litigation.

**RESPONSE TO REQUEST NO. 28:** Denied.

**INTEGRATED INTERROGATORIES**

1. In the event that you do not provide an unqualified admission to any of the above requests for admission, with respect to each such refusal, failure to admit, or qualified admission,

please state the following:

a. All facts, matters or other circumstances upon which said refusal or failure to admit is based; and

b. The identity of all witnesses that have knowledge of each such fact, matter or other circumstance.

**ANSWER:** Plaintiffs include objections and/or other justifications for any qualified and/or partial admission along with their respective Responses to Travelers' individual Requests.

**INTEGRATED REQUEST FOR PRODUCTION OF DOCUMENTS**

1. Identify and produce each and every document upon which you relied to respond to the above requests for admission and integrated interrogatories.

**RESPONSE:** Plaintiffs object to this request on the grounds that it seeks information outside the scope of permissible discovery in accordance with the Federal Rules of Civil Procedure, is irrelevant, is overly broad and seeks discovery of documents not subject to disclosure based on the attorney-client and work-product privileges. Subject to and without waiving their objections, Plaintiffs relied on the documents designated Exhibits A and B attached to Travelers' Requests as well as an uncertified copy of the Travelers Primary and Excess Policies in forming their Responses to Travelers Requests, copies of settlement agreements between Seren, CCI and other parties arising out of the St. Cloud Explosion, the Transcontinental and Continental Policies, the Loan Receipt Agreement, pleadings in the underlying actions, the underlying contracts between Seren, Sirti and CCI and decisions issued by courts in Minnesota or applying Minnesota law.

Respectfully submitted,

TRANSCONTINENTAL INSURANCE COMPANY and CONTINENTAL CASUALTY COMPANY

DATED: 8-11-05

By: ______________________
One of its Attorneys (126627)

Jerome B. Abrams, Esq.
ABRAMS & SMITH, P.A.
220 South Sixth Street
Suite 1250, U.S. Bank Plaza
Minneapolis, MN 55402
Tel: (612) 342-2100
Fax: (612) 342-2107

AND

Matthew R. Wildermuth, Esq.
*(admitted pro hac vice)*
E. Lynette Stafford, Esq.
MECKLER BULGER & TILSON LLP
123 N. Wacker Drive, Suite 1800
Chicago, IL 60606
Tel: (312) 474-7900
Fax: (312) 474-7898 or 7999

SEREN INNOVATIONS, INCORPORATED

By: ______________________
One of its Attorneys

DATED: ______________________

Gary J. Haugen
Maslon Edelman Borman & Brand, LLP
3300 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-4140
Tel: (612) 672-8200
Fax: (612) 672-8397

N:\3918\discover\Response to Travelers Request to Admit.doc

STATE OF MINNESOTA )
) ss. AFFIDAVIT OF SERVICE BY MAIL
COUNTY OF HENNEPIN )

Colleen Gessell of the City of Minneapolis, County of Hennepin, in the state of Minnesota, being duly sworn, says that on the 11th day of August, 2005, she served the annexed:

**PLAINTIFFS' OBJECTIONS AND RESPONSES TO DEFENDANTS' REQUESTS FOR ADMISSION**

upon the following:

Mr. Daniel A. Haws, Esq.
Stacy E. Ertz, Esq.
Murnane, Conlin, White & Brandt, P.A.
444 Cedar Street
Suite 1800
St. Paul, MN 55101-2133

By mailing (and via facsimile transmission) to them a copy thereof, enclosed in an envelope, postage prepaid, and by depositing same in the post office box located at 220 South Sixth Street, Suite 1250, in Minneapolis, Minnesota, directed to said attorney at the above stated address, the last known address of said attorney.

Colleen Gessell

Subscribed and sworn to before me
this 11th day of August, 2005.

Notary Public

CLAIRE GRANT
Notary Public
Minnesota
My Commission Expires January 31, 2010

MURNANE BRANDT

August 16, 2005 ***Reply to St. Paul***

MATTHEW R WILDERMUTH ESQ
LYNNETTE STAFFORD ESQ
MECKLER BULGER & TILSON LLP
123 N WACKER DR STE1800
CHICAGO IL 60606

Re: Seren Innovations, Incorporated, Transcontinental Insurance Company, and Continental Casualty Company v. The Travelers Indemnity Company of America, The Travelers Indemnity Company of Illinois, and Does 1-10
Our File No. 46327

**SENT BY FAX AND U.S. MAIL**

Dear Mr. Wildermuth and Ms. Stafford:

I have received "Seren's Objections and Responses to Defendants' Request for Admissions."

The purpose of this letter is to let you know that I am disappointed in the inadequate and incomplete responses that we have received from Seren, despite assurances that I had from you that I would get full cooperation with complete responses to our request. I believe the title of your pleading is the most clear example of the inadequacies of your responses.

Travelers served not only Requests for Admissions, but also an Integrated Interrogatory and Document Request. We ask you to provide the basis of any denial or qualified admission. Although you did identify the factual basis for your denial or qualified admission for certain of the responses to Request for Admissions, for the most part you failed to provide any basis for your denials.

There is absolutely no way that Travelers can evaluate Seren's position in this case because after this long period of time and numerous conversations that we have had I still do not understand Seren's, or more appropriately, it insurance company's, position.

Your responses to our discovery requests do nothing to help us along in this regard. I have not received any of the documents that would be deemed responsive to our discovery requests.

EXHIBIT 5

There are at least a few pieces of information that would seem that you could provide to me promptly that would help us evaluate Seren's or CNA's position. First, if you now dispute that there is a limit to the additional insured endorsement that clearly exists in the policy of Travelers, I need to know the basis of your position in denial to the request for admission in this regard. What other policy or insurance coverage exists, in your opinion and what is the basis for this opinion?

You are claiming a right to attorney fees, but I have absolutely no information from you documenting the fees for which you seek reimbursement from Travelers. You claim that Seren and CNA is entitled to reimbursement for indemnity dollars and that you have provided me with all of the settlement agreements. Yet, it would appear quite clear to me that there is over a dozen cases that were not listed as settlements between the parties that I know exist.

CNA seeks reimbursement for payments it made for various settlements, but the settlement agreements that were provided are for both CCI and Seren, there is no separation or breakdown of payment contributions between the two entities. It is very obvious that CCI was the major player in this case. CNA is not going to be able to hide behind these facts by virtue of a joint settlement agreement that fails to include a breakdown of settlement amounts. These are just a few examples of the type of information we need.

If you and your clients hope to make any progress at the settlement conference on this case, it is going to be imperative that you give us answers to these questions. I again refer you to the letters that I wrote to Jerry Abrams detailing out very specific information that we need and that we expected to get from you to move forward with the settlement conference. I also remind you that we had these discussions with Judge Noel on a status conference where I raised these concerns.

I look forward to your prompt response to these questions. Keep in mind that Travelers only has a specific amount of coverage for these claims. Seren's failure to provide us with this information can only be detrimental to their claims and ability to seek a recovery from Travelers on the policy limits that exist in light of the claims that Sirti and the intervening plaintiffs settled with Sirti are making.

Feel free to call me with any questions.

Sincerely,

Daniel A. Haws
Attorney at Law
dhaws@murnane.com
DAH/veb/665729
cc: Jerome Abrams, Esq.